# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

T.S.,                       :
             Petitioner      :
                           :
        v.                  :    No. 129 M.D. 2019
                           :    Argued: February 12, 2020
Pennsylvania State Police,       :
           Respondent    :


BEFORE:     HONORABLE MARY HANNAH LEAVITT, President Judge
                  HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE P. KEVIN BROBSON, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE ELLEN CEISLER, Judge
                  HONORABLE J. ANDREW CROMPTON, Judge


**OPINION BY**
**JUDGE COHN JUBELIRER**           **FILED: May 11, 2020**

Presently before the Court is T.S.'s (Petitioner) Application for Summary Relief (Application) on his Petition for Review (Petition) filed in our original jurisdiction. Petitioner seeks mandamus and declaratory relief against the Pennsylvania State Police (PSP), challenging as unconstitutional as applied subchapter I of the most recent enactment of a sexual offender registration scheme, Act of February 21, 2018, P.L. 27 (Act 10), 42 Pa.C.S. §§ 9799.10-9799.75, *as amended by* the Act of June 12, 2018, P.L. 140 (Act 29) (collectively, Act 29[1]). In

---

[1] As the parties, for simplicity, refer in their briefs to the current law as "Act 29," we will do the same.

this case of first impression in our Court, Petitioner, who committed and was convicted and sentenced for his offenses **before** any sexual offender registration scheme existed, argues that the provisions of subchapter I of Act 29 governing his lifetime registration are punitive as applied in violation of the *ex post facto* clauses of the United States and Pennsylvania Constitutions.[2]  Relying upon the Pennsylvania Supreme Court's decision in *Commonwealth v. Muniz*, 164 A.3d 1189 (Pa. 2017), *cert. denied*, __ U.S. __, 136 S. Ct. 925 (2019), in which the Supreme Court determined Act 29's predecessor, the Sexual Offender Registration and Notification Act[3] (SORNA), violated the federal and state *ex post facto* clauses, Petitioner contends subchapter I of Act 29 raises the same constitutional concerns.  Upon review, and following the analysis and reasoning set forth by our Supreme Court in *Muniz*, we conclude that although the General Assembly had a nonpunitive purpose, subchapter I of Act 29 as applied to Petitioner, who committed his offenses before any registration scheme was enacted, is punitive. We grant in part and deny in part the Application, and order PSP not to apply subchapter I of Act 29 to Petitioner, which will result in his removal from the sexual offender registry (Registry).

---

[2] "No . . . *ex post facto* Law shall be passed."  U.S. CONST. art. I, § 9, cl. 3.  "No *ex post facto law* . . . shall be passed."  PA. CONST. art. I, § 17.

[3] *Former* 42 Pa.C.S. §§ 9799.10-9799.41.

## I. History of Sexual Offender Laws in Pennsylvania

### A. *Development of the Law*

A brief overview of the history of sexual offender registration schemes in the Commonwealth and the relevant provisions of Act 29 is necessary before addressing Petitioner's *ex post facto* claims. Act 29 is the fifth iteration of the law commonly referred to as Megan's Law. The prior iterations have all been struck down, or struck down in part, as previously explained by this Court:

> Megan's Law I,[4] the Act of October 24, 1995, P.L. 1079 (Spec. Sess. No. 1), was enacted on October 24, 1995, and became effective 180 days thereafter. Megan's Law II[5] was enacted on May 10, 2000[,] in response to Megan's Law I being ruled unconstitutional by our Supreme Court in *Commonwealth v. Williams*, . . . 733 A.2d 593 ([Pa.] 1999) [(*Williams I*)]. Our Supreme Court held that some portions of Megan's Law II were unconstitutional in *Commonwealth v. Gomer Williams*, . . . 832 A.2d 962 ([Pa.] 2003) [(*Williams II*)], and the General Assembly responded by enacting Megan's Law III[6] on November 24, 2004. The United States Congress expanded the public notification requirements of state sexual offender registries in the Adam Walsh Child Protection and Safety Act of 2006, [(Adam Walsh Act)[7]] . . . , and the Pennsylvania General Assembly responded by passing SORNA on December 20, 2011[,] with the stated purpose of "bring[ing] the Commonwealth into substantial compliance with the

---

[4] *Former* 42 Pa.C.S. §§ 9791-9799.6.

[5] *Former* 42 Pa.C.S. §§ 9791-9799.7.

[6] *Former* 42 Pa.C.S. §§ 9791-9799.75.

[7] 34 U.S.C. §§ 20901-20991, *as amended*. Congress enacted the Adam Walsh Act "[i]n order to protect the public from sex offenders and offenders against children, and in response to the vicious attacks by violent predators," by "establish[ing] a comprehensive national system for the registration of those offenders." 34 U.S.C. § 20901. The Adam Walsh Act requires each state to maintain a state-wide registry that complies with the Adam Walsh Act's minimum requirements for registration information and duration, as well as notification and dissemination of information to the public. A state must substantially comply with the Adam Walsh Act in order to receive certain federal funding; however, a state's inability to implement certain provisions due to violation of the state's constitution is a factor to be considered when determining substantial compliance. 34 U.S.C. § 20927.

[Adam Walsh Act]." [Section 9799.10(1) of SORNA, *former*] 42 Pa.C.S. § 9799.10(1). SORNA went into effect a year later on December 20, 2012. Megan's Law III was also struck down by our Supreme Court for violating the single subject rule of Article III, Section 3 of the Pennsylvania Constitution. *Commonwealth v. Neiman*, . . . 84 A.3d 603, 616 ([Pa.] 2013). However, by the time it was struck down, Megan's Law III had been replaced by SORNA.

*Taylor v. Pa. State Police*, 132 A.3d 590, 595 n.7 (Pa. Cmwlth. 2016). The Supreme Court in *Muniz* explained the evolution of the provisions of these laws and the bases for their being struck down, in whole or in part, as follows:

> Among other things, Megan's Law I established a procedure for adjudicating certain offenders—namely, those that committed one of the predicate offenses listed in the statute—as sexually violent predators [(SVPs)]. The mandated procedure included a postconviction, presentence assessment by the [State Sexual Offender Board (Board)], followed by a hearing before the trial court. . . . If the individual was adjudicated a [SVP], he was subjected to an enhanced maximum sentence of life imprisonment for the predicate offense, as well as registration and community notification requirements that were more extensive than those applicable to an offender who was not adjudicated a [SVP].

> In [*Williams I*], this Court struck down the [SVP] provisions of Megan's Law I based upon the conclusion that a finding of [SVP] status under that enactment entailed a separate factual determination, the end result of which is the imposition of criminal punishment . . . . Notably, in view of the punitive nature of the increased maximum prison sentence, the *Williams I* Court invalidated the challenged provisions without reaching the question of whether the enhanced registration and notification requirements constituted criminal punishment. . . .

> After *Williams I* was decided, the General Assembly passed Megan's Law II . . . . [T]he General Assembly altered the manner in which an individual convicted of a predicate offense was adjudicated a [SVP] . . . . [U]nder Megan's Law II an offender convicted of an enumerated predicate offense [was] no longer presumed to be a [SVP] . . . . Additionally, persons adjudicated to be [SVPs were] no longer subjected to an automatic increased maximum term of imprisonment

4

for the predicate offense. Instead, they [were] required to undergo lifetime registration, notification, and counseling procedures; failure to comply with such procedures [was] penalized by a term of probation or imprisonment.

Under Megan's Law II, any offender convicted of a predicate offense, whether or not he is deemed a [SVP], must: (1) register his current residence or intended residence with [PSP] upon release from incarceration, parole from a correctional institution, or commencement of an intermediate punishment or probation; (2) inform [PSP] within ten days of a change in residence; and (3) register within ten days with a new law enforcement agency after establishing residence in another state.

*Muniz*, 164 A.3d at 1196-97 (quoting *Williams II*, 832 A.2d at 965-68) (internal quotations and citations omitted). The Supreme Court determined in *Williams II* that the SVP provisions, with the exception of the punishments for failure to comply, were constitutional. The General Assembly then enacted amendments, commonly known as Megan's Law III, in which it made the following relevant changes:[8]

added the offenses of luring and institutional sexual assault to the list of enumerated offenses which require a 10-year period of registration . . . ; [] directed the creation of a searchable computerized database of all registered sexual offenders . . . ; [] allowed a sentencing court to exempt a lifetime sex offender registrant, or [SVP] registrant, from inclusion in the database after 20 years if certain conditions are met; [] established mandatory registration and community notification procedures for [SVPs]; . . . and [] mandated the Pennsylvania Attorney General to conduct annual performance audits of state or local agencies [that] participate in the administration of Megan's Law, and, also, required registered sex offenders to submit to fingerprinting and being photographed when registering at approved registration sites.

_____

[8] We have omitted from this list the amendments to provisions that do not relate to an offender's registration requirements.

5

*Id.* at 1198 (quoting *Neiman*, 84 A.3d at 606-07). By the time the Supreme Court struck down Megan's Law III in *Neiman*, SORNA had already been enacted.

SORNA classified offenders and offenses into three tiers, with each tier corresponding to an offender's duration of registration and the frequency with which the offender must appear in person to verify the offender's residence, anywhere from quarterly to annually. Section 9799.15 of SORNA, *former* 42 Pa.C.S. § 9799.15. As the Supreme Court explained in *Muniz*:

> Those convicted of Tier I offenses [were] subject to registration for a period of fifteen years and [were] required to verify their registration information and be photographed, in person at an approved registration site, annually. [*Former*] 42 Pa.C.S. § 9799.15(a)(1), (e)(1). Those convicted of Tier II offenses [were] subject to registration for a period of twenty-five years and [were] required to verify their registration information and be photographed, in person at an approved registration site, semi-annually. [*Former*] 42 Pa.C.S. § 9799.15(a)(2), (e)(2).
>
> . . . .
>
> SORNA also establishe[d] a statewide registry of sexual offenders to be created and maintained by [PSP]. [Section 9799.16(a) of SORNA, *former*] 42 Pa.C.S. § 9799.16(a). The [R]egistry contains information provided by the sexual offender, including: names and aliases, designations used by the offender for purposes of routing or self-identification in [I]nternet communications, telephone numbers, social security number, addresses, temporary habitat if a transient, temporary lodging information, passport and documents establishing immigration status, employment information, occupational and professional licensing information, student enrollment information, motor vehicle information, and date of birth. [*Former*] 42 Pa.C.S. § 9799.16(b). The [R]egistry also contains information from [PSP], including the following: physical description of the offender, including a general physical description, tattoos, scars and other identifying marks, text of the statute defining the offense for which the offender is registered, criminal history information, current photograph, fingerprints, palm prints and a DNA sample from the

6

offender, and a photocopy of the offender's driver's license or identification card.  [*Former*] 42 Pa.C.S. § 9799.16(c).

. . . .

In addition to the offender's duty to appear at an approved registration site . . . all offenders [were] also required to appear in person at an approved registration site within three business days of any changes to their registration information including a change of name, residence, employment, student status, telephone number, ownership of a motor vehicle, temporary lodging, e-mail address, and information related to professional licensing.  [*Former*] 42 Pa.C.S. § 9799.15(g). . . .

*Muniz*, 164 A.3d at 1206-08.


### B. *Muniz*

The Supreme Court struck down SORNA as unconstitutional in *Muniz.  Id.* at 1218.  In *Muniz*, the petitioner committed and was convicted and sentenced for his offense in 2007, when Megan's Law III was in place.  The petitioner absconded and, at the time of his capture in 2014, SORNA dictated his registration requirements.  The petitioner's triggering offense carried a 10-year registration requirement under Megan's Law III but a lifetime registration under SORNA.  The petitioner challenged the retroactive application of SORNA's provisions to him as *ex post facto*.  The Supreme Court agreed with the petitioner, concluding that the increased registration period and the other registration requirements of SORNA, including quarterly in-person registration, in-person verification of registration information, and the dissemination of offenders' personal information online, were punitive provisions.  *Id.*.  After reaching this conclusion, Justice Dougherty, announcing the judgment of the Court, joined by Justices Baer and Donohue, also

determined that "Pennsylvania's *ex post facto* clause provides even greater protections than its federal counterpart."[9]  *Id.* at 1223.

### C. Act 29

In response to *Muniz*, the General Assembly enacted Act 29.  As the Supreme Court recently explained in *Commonwealth v. Butler*, __ A.3d __, __ n.11 (Pa., No. 25 WAP 2018, filed March 26, 2020), slip op. at 10 n.11 (*Butler II*), through subchapter I of Act 29, the General Assembly

> divided SORNA into two subchapters.  Subchapter H is based on the original SORNA statute and is applicable to offenders . . . who committed their offenses after the December 20, 2012 effective date of SORNA; Subchapter I is applicable to offenders who committed their offenses prior to the effective date of SORNA and to whom the *Muniz* decision directly applied.[10]

In the present case, our focus is on the provisions of subchapter I.[11]

---

[9] Justice Wecht, joined by Justice Todd, filed a concurring opinion with respect to this analysis, reasoning that while SORNA was unconstitutional under both the federal and state *ex post facto* clauses, Pennsylvania's *ex post facto* clause did not provide greater protection than its federal counterpart.  *Muniz*, 164 A.3d at 1224 (Wecht, J., concurring).  Chief Justice Saylor dissented, reasoning that SORNA did not impose punishment or violate either the federal or state *ex post facto* clauses.  *Id.* at 1233 (Saylor, C.J., dissenting).

[10] Currently pending before the Supreme Court are *Commonwealth v. Lacombe* (Pa., No. 35 MAP 2018), and *Commonwealth v. Torsilieri* (Pa., No. 37 MAP 2018), on direct appeals from courts of common pleas, which challenge, respectively, the constitutionality of subchapter I and subchapter H of Act 29.

[11] Specifically, subchapter I applies to individuals who were:

> (1) convicted of a sexually violent offense committed on or after April 22, 1996, but before December 20, 2012, whose period of registration with the [PSP], as described in section 9799.55 (relating to registration), has not expired; or

**(Footnote continued on next page…)**

As set forth in the legislative findings and declaration of policy of subchapter I, the General Assembly has determined that sexual offenders pose a high risk of reoffending after release from incarceration and "[i]f the public is provided adequate notice and information" about offenders, "the community can develop constructive plans to prepare itself." Section 9799.51(a)(1) of Act 29, 42 Pa.C.S. § 9799.51(a)(1). The General Assembly's intent through subchapter I of Act 29 is to respond to *Muniz*, "[p]rotect the safety and general welfare of the people of the Commonwealth," and to "[r]equire the exchange of relevant information about" sexual offenders through registration and community notification provisions. 42 Pa.C.S. § 9799.51(b)(1), (2).

In order to achieve these purposes, subchapter I of Act 29 requires that, upon release from incarceration, offenders provide PSP with information for current or intended residences, employment, and enrollment as a student. Section 9799.56(a)(1) of Act 29, 42 Pa.C.S. § 9799.56(a)(1). Offenders "shall inform [PSP] within three business days of" changes in: residence, employment/employment location, and institution or location where the individual is enrolled as a student. 42 Pa.C.S. § 9799.56(a)(2). Offenders are also required to verify their residence and "shall appear within 10 days before each annual anniversary date of the offender's initial registration . . . at an approved registration site to complete a verification form and to be photographed." Section 9799.60(b) of Act 29, 42 Pa.C.S. § 9799.60(b). Offenders who fail to comply with the

---

**(continued…)**

      (2) required to register with the [PSP] under a former sexual offender registration law of this Commonwealth on or after April 22, 1996, but before December 20, 2012, whose period of registration has not expired.

Section 9799.52 of Act 29, 42 Pa.C.S. § 9799.52.

registration and verification provisions "may be subject to prosecution under [Section 4915.2 of the Crimes Code,] 18 Pa.C.S. § 4915.2[12] (relating to failure to comply with 42 Pa.C.S. Ch. 97 Subch. I registration requirements)." 42 Pa.C.S. §§ 9799.56(d), 9799.60(e).

As with former iterations of the statutory scheme, subchapter I of Act 29 maintains the distinction between offenders who have committed a sexual offense and SVPs. As in prior versions of the statute, SVPs are those individuals convicted of certain statutorily enumerated sexually violent offenses who are **also** assessed by the Board and determined in a separate proceeding to be SVPs "due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses." Section 9799.53 of Act 29, 42 Pa.C.S. § 9799.53; *see also* Section 9799.58 of Act 29, 42 Pa.C.S. § 9799.58. SVPs are subject to different and more intensive registration requirements than non-SVP sexual offenders. For example, under subchapter I of Act 29, SVPs are still required to verify their residence and appear for registration quarterly. 42 Pa.C.S. § 9799.60(a).

---

[12] Specifically, Section 4915.2(a) of the Crimes Code provides:

**(a) Offense defined.--**An individual who is subject to registration under 42 Pa.C.S. § 9799.55(a), (a.1) or (b) (relating to registration) or who was subject to registration under former 42 Pa.C.S. § 9793 (relating to registration of certain offenders for ten years) commits an offense if the individual knowingly fails to:
(1) register with [PSP] as required under 42 Pa.C.S. § 9799.56 (relating to registration procedures and applicability);
(2) verify the individual's residence or be photographed as required under 42 Pa.C.S. § 9799.60 (relating to verification of residence); or
(3) provide accurate information when registering under 42 Pa.C.S. § 9799.60.

18 Pa.C.S. § 4915.2(a).

10

For all offenders, including SVPs, Section 9799.63(b)(1) of Act 29 (Internet dissemination provision) requires PSP to "[d]evelop and maintain a system for making publicly available by electronic means" specified information about offenders "so that the public may, without limitation, obtain access to the information via an Internet website to view an individual record or the records of all [SVPs], lifetime registrants, and other offenders who are registered with [PSP]." 42 Pa.C.S. § 9799.63(b)(1). The General Assembly set forth specific legislative findings for the Internet dissemination provision. Specifically, the General Assembly concluded public safety will be enhanced by making information about sexual offenders available through the Internet, which allows the information to be "readily accessible" to the public so that it may "undertake appropriate remedial precautions . . . ." 42 Pa.C.S. § 9799.63(a). The General Assembly intends the Internet dissemination provision "solely as a means of public protection" that "shall not be construed as punitive." *Id.*

The Internet dissemination provision requires PSP to maintain and disseminate the following information about each offender:

> (i) name and all known aliases; (ii) year of birth; (iii) . . . the street address, municipality, county and zip code of all residences, including, where applicable, the name of the prison or other place of confinement; (iv) the street address, municipality, county, zip code and name of an institution or location at which the person is enrolled as a student; (v) the municipality, county and zip code of an employment location; (vi) a photograph of the individual, which shall be updated not less than annually; (vii) a physical description of the offender, including sex, height, weight, eye color, hair color, and race; (viii) identifying marks, including scars, birthmarks and tattoos; (ix) the license plate number and description of a vehicle owned or registered to the offender; (x) whether the offender is currently compliant with registration requirements; (xi) whether the victim is a minor; (xii) a description of the offense or offenses which triggered

11

the application of this subchapter; [and] (xiii) the date of the offense and conviction, if available . . . .

42 Pa.C.S. § 9799.63(c)(1); *see also* 42 Pa.C.S. § 9799.63(c)(2) (requiring that all of this information shall be posted for all offenders). This information remains available on the Internet for the lifetime of SVPs and lifetime registrants and the duration of the registration period for all other offenders. 42 Pa.C.S. § 9799.63(d). Subchapter I of Act 29 also contains provisions relating to PSP's duty to inform and notify victims, local police departments, municipalities, and other enumerated individuals of changes in an offender's or SVP's registration information. Sections 9799.61 and 9799.62 of Act 29, 42 Pa.C.S. §§ 9799.61, 9799.62.

Finally, Section 9799.59(a)(1) of Act 29 allows offenders to request an exemption from all of the aforementioned registration requirements if:

> [a]t least 25 years have elapsed prior to filing a petition [for exemption] with the sentencing court to be exempt from the requirements of this subchapter, during which time the [offender] has not been convicted in this Commonwealth or any other jurisdiction or foreign country of an offense punishable by imprisonment of more than one year, or the [offender's] release from custody following the [offender's] most recent conviction for an offense, whichever is later.

42 Pa.C.S. § 9799.59(a)(1). In such cases, the offender may file a petition for exemption, and the sentencing court shall order the offender be assessed by the Board. The Board shall issue a written report, and the sentencing court, after conducting a hearing,

> shall exempt the [offender] from any or all of the requirements of this subchapter, at the discretion of the court, only upon a finding of clear and convincing evidence that exempting the [offender] from . . . the requirements of this subchapter is not likely to pose a threat to the safety of any other person.

12

42 Pa.C.S. § 9799.59(a)(5).

   *D. Key Cases*

   Along with *Muniz*, the following cases are instructive for our analysis of Act 29, as they apply *ex post facto* principles to sexual offender registration laws. First, we are guided by the United States Supreme Court's decision in *Smith v. Doe*, 538 U.S. 84 (2003), upon which the Supreme Court relied in *Muniz*. Throughout *Muniz*, the Supreme Court compared SORNA to the Alaska sexual offender registration statute that the United States Supreme Court determined in *Smith* did not violate the prohibition against *ex post facto* laws. *Smith*, 538 U.S. at 92. The Alaska statute in *Smith* was retroactively applied to the respondents, who had committed their crimes before there was a registration scheme. *Id.* at 91. However, the Supreme Court did not strike down the mere registration of such offenders retroactively, analyzing instead the provisions governing registration, which included an online database with information about offenders' criminal convictions and requirements for periodic updates by offenders, and determining these provisions were nonpunitive. *Id.* at 105.

   Along with *Smith*, our Supreme Court's decision in *Williams II*, analyzing an *ex post facto* challenge to certain Megan's Law II provisions, is also instructive. The appellees in *Williams II* committed their sexual offenses in 2000 and 2001, were determined by the Board to be SVPs, and challenged the SVP registration, notification, and counseling provisions of Megan's Law II as punitive. 832 A.2d at 965. The appellees argued that the requirements for registering current addresses, notifying PSP within 10 days of change in residence, and mandatory monthly counseling were punitive. Relying in part upon the analytic framework set forth in *Smith*, the Court in *Williams II* concluded that the General Assembly had a

13

nonpunitive intent and the "registration, notification, and counseling provisions constitute[d] non[]punitive, regulatory measures supporting a legitimate governmental purpose." *Id.* at 986. The Court also determined "[t]he prescribed penalties for failure to register and verify one's residence as required [were] unconstitutionally punitive, but severable." *Id.*

Along with *Smith* and *Williams II*, our analysis is guided by two recent cases analyzing Act 29. Most recently, in *Butler II,* the Supreme Court examined whether SVP registration requirements in subchapter H of Act 29 constitute criminal punishment, and, relying upon *Muniz* and *Williams II*, concluded that they do not. *Butler II*, __ A.3d at __, slip op. at 30. The appellee in *Butler II* committed his crimes while SORNA was in effect and, prior to sentencing, was assessed and designated a SVP. On appeal following the appellee's post-sentence motions, the Superior Court determined, based upon *Muniz*, that the SVP registration requirements of subchapter H are punitive and unconstitutional. *Commonwealth v. Butler*, 173 A.3d 1212 (Pa. Super. 2017) (*Butler I*), *rev'd*, *Butler II*, __ A.3d __, (2020). The Supreme Court disagreed that the lifetime registration, notification, and counseling requirements (RNC requirements) for SVPs constituted punishment. The Supreme Court concluded:

> Although we recognize the RNC requirements impose affirmative disabilities or restraints upon SVPs, and those requirements have been historically regarded as punishment, our conclusions in this regard are not dispositive on the larger question of whether the statutory requirements constitute criminal punishment. This is especially so where the government in this case is concerned with protecting the public, through counseling and public notification rather than deterrent threats, not from those who have been convicted of enumerated crimes, but instead from those who have been found to be dangerously mentally ill. . . . Under the circumstances, and also because we do not find the RNC requirements to be excessive in light of the heightened public safety concerns attendant to SVPs, we

14

conclude the RNC requirements do not constitute criminal punishment.

*Butler II*, __ A.3d at __, slip op. at 30 (citations omitted).[13]

Last, the Superior Court recently analyzed the constitutionality of the Internet dissemination provision of subchapter I of Act 29 in *Commonwealth v. Moore*, 222 A.3d 16 (Pa. Super. 2019).[14] The appellant in *Moore* appealed to the Superior Court from a judgment of sentence, challenging his obligation to register under subchapter I of Act 29 for offenses committed between 2004 and 2008 and asserting that subchapter I of Act 29 "include[d] several punitive elements not in effect at the time he committed his crimes." *Id.* at 18. The Superior Court determined the appellant's arguments were a narrow challenge to the Internet dissemination provision. Evaluating the appellant's arguments under an *ex post facto* analysis, the Superior Court agreed with the appellant, determining that the Internet dissemination provision was nearly identical to the SORNA website provision and, therefore, punitive but severable. *Id.* at 27.

With the relevant statutory history and case law as a foundation, we turn to Petitioner's challenge to his registration obligation under subchapter I as an offender who commited his triggering offenses before the enactment of any registration scheme.

---

[13] Justice Mundy authored a concurring opinion in *Butler II*, disagreeing that the provisions of subchapter H constituted an affirmative disability or restraint and were sanctions historically regarded as punishment. *See Butler II*, __A.3d __ (Pa., No. 25 WAP 2018, filed March 26, 2020) (Mundy, J., concurring).

[14] While not binding, Superior Court decisions "offer persuasive precedent where they address analogous issues." *Lerch v. Unemployment Comp. Bd. of Review*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

## II.   Background

### A. Petition

Petitioner avers as follows in his Petition.  Petitioner was convicted on June 23, 1992, of aggravated indecent assault and attempted rape, offenses that he committed in 1990.  (Petition ¶¶ 6-8.)  Petitioner was sentenced to 3 to 10 years' imprisonment followed by probation.  (*Id.* ¶ 9.)  There was no sexual offender registration and notification scheme in existence at the time Petitioner committed the offenses or was convicted and sentenced.  (*Id.* ¶ 11.)  Petitioner "maxed out his sentence" and was released from incarceration in 2002, began registering with PSP that same year, and is still currently registering as a sexual offender.  (*Id.* ¶¶ 5, 10, 11.)  Under the current registration scheme, Petitioner is classified as a lifetime registrant.  (*Id.* ¶ 13.)  Through the Internet dissemination provision of subchapter I of Act 29, Petitioner's registration with PSP makes available to anyone with Internet access Petitioner's current picture, prior pictures dating back to 2016, physical description, residential address, general employment/employer location, vehicle description, and description of the offenses for which he was convicted.  (*Id.* ¶ 14.)

Following the Pennsylvania Supreme Court's decision in *Muniz*, Petitioner, through counsel, mailed a letter on December 12, 2018, to PSP regarding Petitioner's registration status (Letter).  Relying upon *Muniz* and the statutory language of subchapter I of Act 29, Petitioner asserted in the Letter that he was not subject to registration as a sexual offender or a SVP, and requested that PSP remove him from the Registry and "extinguish any further need on his part from registering in the future."  (Letter, Ex. A; *see also* Petition ¶ 16.)  Petitioner further requested that if PSP could not comply with these requests, it "reply as to the

16

reasons why and the statutory basis [PSP] believe[d] require[d] [Petitioner's] continued registration under [Act 29]."  (Letter, Ex. A; *see also* Petition ¶ 17.) Counsel for PSP called Petitioner's counsel in response to the "[L]etter, notifying Petitioner's counsel that PSP could not comply with the demands" set forth in the Letter and explaining PSP's basis for concluding Petitioner was still subject to registration requirements.  (Petition ¶ 18.)  Petitioner asserts that subchapter I of Act 29, governing continued registration of sexual offenders, is *ex post facto* as applied to him and filed the instant Petition.

In Count I of the Petition, Petitioner seeks declaratory relief from this Court, averring that pursuant to *Muniz*, "[s]ubchapter I of [Act 29] does not apply to him under any reasonable construction of the statute," and "any iteration of Pennsylvania's sex[ual ]offender[ ]registration scheme is an unconstitutional *ex post fact*[*o*] law as applied to him."  (*Id.* ¶¶ 23-24.)  In Count II, Petitioner seeks mandamus relief on the basis that:  Act 29, which post-dates his offenses, does not apply to him; PSP has a duty to create and maintain the Registry; and there is no other adequate and appropriate remedy to challenge the alleged unlawful application of Act 29 to Petitioner.  (*Id.* ¶ 29.)  Petitioner asks this Court to "declare [Act 29] unconstitutional . . . as applied to him" and issue a writ of mandamus "to compel PSP to permanently remove Petitioner from the . . . [R]egistry."[15]  (Petition, Wherefore Clause.)

---

[15] Although Petitioner characterizes the relief he seeks as declaratory and mandamus, it sounds in declaratory and injunctive relief.  In *Taylor v. Pennsylvania State Police*, 132 A.3d 590 (Pa. Cmwlth. 2016), the petitioner filed a petition sounding in mandamus seeking to have SORNA declared unconstitutional as applied and his registration requirements thereunder relieved.  This Court held that while mandamus was not the proper form of the action, we would treat it as a request for declaratory and injunctive relief, as "[f]orm must not be exalted over substance."  *Id.* at 600 (quoting *In re Tax Claim Bureau*, 436 A.2d 144, 146 (Pa. 1981)). **(Footnote continued on next page…)**

## B. *Answer and New Matter and Petitioner's Reply*

PSP filed an Answer and New Matter, admitting the factual allegations as to Petitioner's convictions, sentencing,[16] and status as a lifetime registrant, and PSP's receipt of the Letter and response thereto. PSP also admits that there was no sexual offender registration scheme in place at the time Petitioner committed his crimes or was convicted and sentenced. (Answer & New Matter ¶ 11.) PSP denies any conclusions of law relating to Petitioner's contention that he should not be subject to the registration requirements of subchapter I of Act 29.[17]

In New Matter, PSP asserts that subchapter I of Act 29 is not a criminal punishment but "a civil registration system," and neither PSP nor this Court can alter Petitioner's registration obligations. (*Id.* ¶¶ 31-33.) PSP further asserts that, upon information and belief, Petitioner poses a threat to society due to the high rates of recidivism among adult sexual offenders like Petitioner, and subchapter I of Act 29 is narrowly tailored to protect the public, which is a compelling state interest. (*Id.* ¶ 34.) Subchapter I of Act 29 also is narrowly tailored to serve a compelling state interest of "notifying and protecting the public" through the registration of offenders and Internet dissemination of offenders' information, PSP asserts. (*Id.* ¶ 42.) PSP alleges that it is required by the Adam Walsh Act to create

---

**(continued…)**

Accordingly, as we did in *Taylor*, we will treat the Petition as a request for declaratory and injunctive relief.

[16] PSP denied that Petitioner "maxed out his sentence," as it could neither confirm nor deny that averment. (Answer & New Matter ¶ 10.)

[17] PSP also denies that Petitioner's registration under Act 29 requires him to provide his vehicle information. (*Id.* ¶ 14.) However, our review of the provisions of Act 29 demonstrate that the Internet dissemination provision requires dissemination of Petitioner's "license plate number and description of a vehicle owned or registered" to him. 42 Pa.C.S. § 9799.63(c)(1)(ix).

18

and maintain the Registry and share the information on the Registry with law enforcement and the public. (*Id.* ¶¶ 36-40.) PSP further contends that the minimum registration requirements set forth by the Adam Walsh Act are retroactive for offenders convicted prior to its enactment. Subchapter I of Act 29 is not a reenactment of SORNA, PSP alleges, as it differs from SORNA. (*Id.* ¶¶ 49-50.) Finally, PSP asserts that Petitioner has always been classified as a lifetime offender under every iteration of the sexual offender registration schemes and, therefore, there is no *ex post facto* violation. (*Id.* ¶ 51.)

Petitioner filed a Reply to New Matter denying all of PSP's conclusions of law.

### C. Application

After the pleadings closed, Petitioner filed the instant Application. Petitioner emphasizes that PSP admits: the crimes for which Petitioner was convicted; the sentence he served; the nonexistence of a sexual offender registration scheme at the time of commission of, or conviction for, the crimes; Petitioner's current status as a lifetime registrant; and the breadth of Petitioner's personal information publicly available because of the Internet dissemination provision. Petitioner contends the only dispute between the parties is purely legal: whether Petitioner is required to continue registering under subchapter I. Petitioner asserts he is entitled to relief because his registration under subchapter I of Act 29 violates the prohibition against *ex post facto* laws, particularly in light of *Muniz.* Petitioner asks that this Court grant the Application and "enter judgment . . . in favor of Petitioner, declaring [Act 29] (and [s]ubchapter I thereof) an unconstitutional *ex post facto* law as applied and thereafter compelling [PSP] to permanently remove Petitioner from the . . . [R]egistry." (Application, Wherefore

19

Clause.)  None of our prior case law has addressed the application of subchapter I of Act 29 in the wake of *Muniz* to offenders who committed offenses **prior** to the enactment of **any** sexual offender registration scheme.

**III.   *Ex Post Facto* Considerations**

This Court "may grant summary relief where the dispute is legal rather than factual," there are no facts in dispute, and the "right to relief is clear." *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1220 (Pa. Cmwlth. 2018).  In reviewing the record, we do so "in the light most favorable to the opposing party." *Id.*  "Even if the facts are undisputed, the moving party has the burden of proving that its right to relief is so clear as a matter of law that summary relief is warranted." *Naylor v. Dep't of Pub. Welfare*, 54 A.3d 429, 431 n.4 (Pa. Cmwlth. 2012), *aff'd*, 76 A.3d 536 (Pa. 2013).

The prohibition on *ex post facto* laws "ensures that individuals have fair warning of applicable laws and guards against vindictive legislative action." *Peugh v. United States*, 569 U.S. 530, 544 (2013).  Therefore, the *ex post facto* clause "safeguards 'a fundamental fairness interest . . . in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.'"  *Id.* (quoting *Carmell v. Texas*, 529 U.S. 513, 533 (2000)).  There are traditionally four categories of laws that violate the prohibition on *ex post facto* laws, including laws that:  (1) make criminal and punish actions that were innocent at the time they were committed before the law was passed; (2) aggravate a crime to something greater than it was at the time it was committed; (3) "change[] the punishment" and "inflict[] a greater punishment[] than the law annexed to the crime at the time it was committed"; or (4) alter the rules of evidence from that required at the time the crime was

20

committed. *Carmell*, 529 U.S. at 522 (emphasis omitted) (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798)). As in *Muniz*, Petitioner's claims here implicate the third category, as he asserts subchapter I of Act 29 "inflicts a greater punishment" than was linked to his crime at the time it was committed. *Carmell*, 529 U.S. at 522; *see also Muniz*, 164 A.3d at 1196 (same). Where a law falls within the aforementioned categories and disadvantages the offender, it is "*ex post facto . . . and constitutionally infirm.*" *Muniz*, 164 A.3d at 1196 (quoting *Commonwealth v. Young*, 637 A.2d 1313, 1318 (Pa. 1993)). We note that "[c]ritical to relief under the [*e*]*x* [*p*]*ost* [*f*]*acto* [c]lause is **not** an individual's right to **less punishment**, but the **lack** of **fair notice** and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Weaver v. Graham*, 450 U.S. 24, 30 (1981) (emphasis added). Thus, we are cognizant that the crucial "inquiry for determining whether the application of [subchapter I of Act 29] to a convicted sex offender violates *ex post facto* prohibitions is the **date of the offense**." *Commonwealth v. Wood*, 208 A.3d 131, 136 (Pa. Super. 2019) (emphasis added).

As set forth by our Supreme Court in *Muniz*, we follow the established framework for approaching and analyzing the constitutionality of a law under the *Ex Post Facto* clause of the United States Constitution. Like our Supreme Court and the United States Supreme Court, we apply a two-prong analysis to determine whether a law inflicts a greater punishment. First, we look to see whether the General Assembly's intent is "to impose punishment." *Smith*, 538 U.S. at 92. If so, the law is punitive. *Id.* If the General Assembly's intent is to enact a nonpunitive civil regulatory scheme, we proceed to the second prong to determine whether the statute "is so punitive either in purpose or effect as to negate the

21

[General Assembly's] intention to deem it civil." *Id.* (internal quotations omitted). In order to determine whether the statute is so punitive as to negate the General Assembly's intent, our review is guided by the factors set forth by the United States Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963). Commonly known as the *Mendoza-Martinez* factors, these seven factors are "applied to determine whether an Act of Congress is penal or regulatory in character":

> [1.] whether the sanction involves an affirmative disability or restraint, [2.] whether it has historically been regarded as punishment, [3.] whether it comes into play only on a finding of scienter, [4.] whether its operation will promote the traditional aims of punishment – retribution and deterrence, [5.] whether the behavior to which it applies is already a crime, [6.] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7.] whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 168-69 (footnotes omitted). The *Mendoza-Martinez* factors are intended to be "useful guideposts" that are "neither exhaustive nor dispositive." *Smith*, 538 U.S. at 97. "[O]nly the clearest proof may establish that a law is punitive in effect," and "in determining whether a statute is civil or punitive, we must examine the law's **entire statutory scheme**." *Muniz*, 164 A.3d at 1208 (emphasis added) (quotation omitted) (citing *Smith*, 538 U.S. at 92).

## IV.    Discussion

As we analyze the parties' arguments, we are mindful of the "general presumption that all lawfully enacted statutes are constitutional." *Muniz*, 164 A.3d at 1195. Petitioner argues that subchapter I of Act 29, as applied to him, is an *ex post facto* law containing the same characteristics of SORNA that the Pennsylvania

22

Supreme Court determined in *Muniz* to be punitive in violation of the prohibition against *ex post facto* laws. Pursuant to subchapter I of Act 29, Petitioner notes that he must: register for life; notify PSP within three business days of a change in residency or employment; appear annually to verify residence and be photographed; be subject to criminal sanction if he fails to verify his residence or notify PSP of changes; and "[b]e subject to display on the [I]nternet for life" through the Internet dissemination provision. (Petitioner's Brief (Br.) at 9-10.) These provisions, Petitioner asserts, are punitive under a *Mendoza-Martinez* analysis and our Supreme Court's reasoning in *Muniz*. Before we reach the *Mendoza-Martinez* analysis, however, we must begin with the first prong of the *ex post facto* analysis, which is to determine whether the General Assembly's intent is punitive. *Smith*, 538 U.S. at 92.

### A. *General Assembly's Intent*

PSP asserts that based upon the General Assembly's declaration of policy in Act 29, subchapter I "shall not be construed as punitive" and is intended to "[a]ddress the Pennsylvania Supreme Court's decision in . . . *Muniz*." 42 Pa.C.S. § 9799.51(b)(2), (4). Relying on the principle that "[t]here is a strong presumption [that] legislative enactments are constitutional," *Commonwealth v. McMullen*, 961 A.2d 842, 846 (Pa. 2008), PSP argues that the General Assembly's intent was not to punish and, therefore, subchapter I of Act 29 can only be found unconstitutional upon a weighing of the *Mendoza-Martinez* factors. Petitioner apparently does not dispute this, as he argues only the merits of his case under the *Mendoza-Martinez* factors, an analysis which is implicated only if it is determined that the General Assembly's intent was nonpunitive.

23

Guided by the Supreme Court's reasoning and analysis in *Muniz*, we conclude that General Assembly had a nonpunitive intent in enacting subchapter I of Act 29. When determining whether the General Assembly intended to punish, we look to the text and structure of the statute, with "considerable deference . . . accorded to the intent as the legislature has stated it." *Smith*, 538 U.S. at 93. The General Assembly sets out a number of legislative findings and corresponding declarations of policy in subchapter I of Act 29 and expressly states that it "shall not be construed as punitive." 42 Pa.C.S. § 9799.51(b)(2). Through subchapter I of Act 29, the General Assembly seeks to "[p]rotect the safety and general welfare of the people of this Commonwealth," "[r]equire the exchange of relevant information . . . as a means of assuring public protection," and address the Supreme Court's decision in *Muniz*. 42 Pa.C.S. § 9799.51(b)(1), (2), (4). As the Supreme Court recently explained in *Butler II* with regard to subchapter H, much of the legislative intent and declaration of policy of Act 29 is similar to that in SORNA, which the Supreme Court found, in *Muniz*, did not demonstrate a legislative intent to punish. *Butler II*, __ A.3d at __, slip op. at 21-22. In both SORNA and Act 29, respectively, the General Assembly explained "[i]f the public is provided adequate notice and information about sexual offenders," then "the community can develop constructive plans to prepare itself . . . ." Section 9799.11(a)(3) of SORNA, *former* 42 Pa.C.S. § 9799.11(a)(3); 42 Pa.C.S. § 9799.51(a)(1). The General Assembly also made legislative findings in both iterations of the law that sexual offenders pose a high risk of reoffending and have a reduced expectation of privacy, and the release of information about sexual offenders to agencies and the public will further public safety. *Former* 42 Pa.C.S. § 9799.11(a)(4)-(6); 42 Pa.C.S. § 9799.51(a)(2), (4)-(6). With regard to its

declaration of policy, the General Assembly declared in both SORNA and subchapter I of Act 29 its intent to protect the safety and welfare of people of the Commonwealth and require the exchange of relevant information about sexual offenders for that purpose. *Former* 42 Pa.C.S. § 9799.11(b)(1)-(2); Section 9799.51(b)(1)-(2) of Act 29, 42 Pa.C.S. § 9799.51(b)(1)-(2).

As the Supreme Court did in *Muniz* with regard to SORNA and *Butler II* with regard to subchapter H, we discern nothing in the express legislative intent of subchapter I of Act 29, to which we afford "considerable deference," *Smith*, 538 U.S. at 93-94, demonstrating that the General Assembly **intended** punishment as its aim. This is also consistent with the Superior Court's recent decision in *Moore*, 222 A.3d at 20-21. Subchapter I of Act 29, like its predecessors, is intended by the General Assembly "to create a civil, remedial scheme." *Id.* at 21 (citing *Muniz*, 164 A.3d at 1209-10; *Williams II*, 832 A.2d at 971-72; *Commonwealth v. Gaffney*, 733 A.2d 616, 619 (Pa. 1999)). Because the General Assembly's intent is nonpunitive, we move to the *Mendoza-Martinez* factors to determine whether subchapter I of Act 29 is punitive in nature such that it overcomes, or negates, the General Assembly's nonpunitive purpose.

### B. *Mendoza-Martinez Factors*

We next analyze the *Mendoza-Martinez* factors for purposes of determining whether the provisions of subchapter I of Act 29 are penal in nature. We reiterate that the factors are intended to be "useful guideposts" that are "neither exhaustive nor dispositive." *Smith*, 538 U.S. at 97. Further. "only the clearest proof may establish that a law is punitive in effect," and "in determining whether a statute is civil or punitive, we must examine the law's entire statutory scheme." *Muniz*, 164 A.3d at 1208 (citing *Smith*, 538 U.S. at 92) (quotation omitted).

25

1. <u>Whether the sanction involves an affirmative disability or restraint.</u>

Petitioner argues that subchapter I of Act 29 acts as an affirmative disability or restraint on him that was not in place at the time of his offense or conviction. Subchapter I of Act 29 imposes requirements for notification to PSP of changes in residence or employment and in-person annual registration. Petitioner contends that these requirements are "the same restraint[s]" as those in SORNA, which included quarterly in-person registration, in-person appearances for changes in employment or residence, and "secondary disabilities," such as "finding and keeping housing and employment," and an increased "likelihood that an offender may be subject to violence and adverse social and psychological impacts." (Petitioner's Br. at 11.) The Supreme Court determined these requirements weighed in favor of finding SORNA punitive in *Muniz*, Petitioner argues, and "there[ is] little appreciable difference in the restraint that Act 29 imposes when compared to [SORNA]"; thus, this factor weighs in favor of subchapter I of Act 29 being punitive. (*Id*. at 12.)

PSP responds that subchapter I of Act 29 does not impose an affirmative disability or restraint. PSP argues that the Supreme Court held otherwise in *Muniz* because SORNA required quarterly in-person reporting and in-person verification requirements for updates in information. PSP asserts that the General Assembly responded to these concerns in Act 29 by: requiring in-person reporting only once a year, with the exception of transient individuals and SVPs, of which Petitioner is not; eliminating in-person reporting requirements for changes in residence, employment, or education; reducing the duration of registration for certain offenses; eliminating certain offenses entirely from registration requirements; and providing offenders the opportunity to petition for removal from registration

26

requirements after 25 years. Given these changes between SORNA and subchapter I of Act 29, PSP argues this factor weighs in favor of finding subchapter I of Act 29 to be nonpunitive.

In *Muniz*, the petitioner committed his offenses when Megan's Law III governed, mandating a 10-year registration. The petitioner absconded, and SORNA governed his registration at the time of his capture, mandating a lifetime registration. Thus, the basis of the Supreme Court's review of the petitioner's challenge was that SORNA placed registration requirements on the petitioner that were not in place at the time he committed the offense. With regard to the first *Mendoza-Martinez* factor, our Supreme Court compared SORNA to the Alaska registration statute at issue in *Smith*. The United States Supreme Court in *Smith* determined that while offenders subject to the Alaska statute were required to notify authorities of changes in residence and other information, they were **not** required to do so **in person**; thus, there was no affirmative disability or restraint. *Id.* at 101-02. Our Supreme Court in *Muniz* concluded that this was an important distinction, as SORNA required quarterly **in-person** registration for the petitioner, and **in-person** verification of changes to information. *Muniz*, 164 A.3d at 1210. Our Supreme Court also acknowledged it determined in *Williams II* that the counseling requirements for SVPs under Megan's Law II, an arguably more onerous requirement, were not a disability or restraint. The Court in *Muniz* distinguished the in-person reporting requirements for **all offenders** under SORNA from counseling sessions intended to help offenders independently determined to be SVPs under Megan's Law II. 164 A.3d at 1211 (citing *Williams II*, 832 A.2d at 975).

The Supreme Court in *Muniz* explained that, for the petitioner's Tier III sexual offense, SORNA required the petitioner to "appear in person at a registration site four times a year, a minimum of 100 times over the next twenty-five years, extending for the remainder of his life," without "account[ing] for the times he must appear due to his 'free' choices including 'moving to a new address or changing his appearance.'" *Muniz*, 164 A.3d at 1210-11 (quoting *former* 42 Pa.C.S. § 9799.15(g)). While our Supreme Court in *Muniz* emphasized the multiple times per year and over a lifetime that an offender was required to appear in person under SORNA, it also more generally stated that it found "the in-person reporting requirements, for both verification and changes to an offender's registration, to be a direct restraint upon [the petitioner] and hold this factor weighs in favor of finding SORNA's effect to be punitive." *Id.* at 1211. Accordingly, SORNA's in-person reporting and verification requirements were "a direct restraint" on the petitioner, the Supreme Court stated, and weighed in favor of finding SORNA to be punitive. *Id.*

Subsequently, in *Butler II*, the Supreme Court provided further analysis in determining that the RNC requirements for SVPs under subchapter H of Act 29 **were** a restraint and affirmative disability on SVPs, noting the reporting requirements were identical to those for Tier III offenders under SORNA and require SVPs to appear in person for changes to information and quarterly registration. *Butler II*, __ A.3d at __, slip op. at 23. The Supreme Court, relying on *Muniz*, therefore concluded this factor weighed in favor of finding subchapter H to be punitive. The Supreme Court cautioned "[i]t is important to note, however, that merely placing affirmative disabilities on SVPs does not inexorably lead to the conclusion that the government has imposed **punishment**" because the state can

28

restrict the freedom of the "dangerously mentally ill." *Id.* (emphasis added) (quotation omitted). SVPs, who have undergone subsequent evaluation, are subject to the RNC requirements not because of their convictions, but because they have been found to be dangerously mentally ill, similar to mental health commitments. This is a legitimate nonpunitive interest.

We note that Petitioner in this matter is not a SVP or subject to subchapter H, and committed his crimes prior to the existence of a registration scheme. However, the Supreme Court's interpretation and explanation of *Muniz* in *Butler II* is instructive as to what provisions should be considered punitive and whether a legitimate interest underlies those provisions. Under subchapter I of Act 29, Petitioner, who is **not a SVP**, is required to appear for **in-person registration annually**. 42 Pa.C.S. § 9799.60(b). While Petitioner is still required under subchapter I of Act 29 to notify PSP of any changes in residence, employment, or education enrollment, he is **not** required to personally appear for verification of those changes as he would have been under SORNA. *Compare former* 42 Pa.C.S. § 9799.15(g), *with* 42 Pa.C.S. § 9799.56(a)(2). To this extent, subchapter I of Act 29 is reminiscent of the requirements in place for offenders under Megan's Law II and Megan's Law III, both of which required offenders to register current residences with PSP and notify PSP within 10 days of a change in residence. *See* Section 9795.2(a)(2) of Megan's Law III, *former* 42 Pa.C.S. § 9795.2(a)(2). However, "*Muniz* was a sea change in the longstanding law of this Commonwealth . . . ." *Butler I*, 173 A.3d at 1215. Distinguishing *Smith* and *Williams II*, the Supreme Court in *Muniz* disapproved of **in-person registration** and verification provisions that mandated the offender's appearance multiple times over the course of the offender's lifetime, emphasizing the onerous nature of such requirements to

29

a petitioner to whom the statute was retroactively applied. *Muniz*, 164 A.3d at 1211. The Supreme Court reaffirmed this position in *Butler II*, concluding that onerous in-person registration requirements for SVPs in subchapter H, like those in SORNA, weigh in favor of finding this factor punitive. *Butler II*, __ A.3d at __, slip op. at 23.

The Supreme Court disapproved not only of in-person appearances, but the frequency of those appearances for the petitioner in *Muniz*. Under SORNA, Tier I and Tier II offenders were subject to annual and semi-annual in-person registration, respectively. Given the petitioner's status as a Tier III offender with quarterly in-person registration, the Supreme Court in *Muniz* did not address whether the lesser in-person registrations under SORNA still constituted an affirmative disability or restraint. Nonetheless, the Supreme Court did not sever portions of SORNA, such as the quarterly in-person registration, instead determining that the entire statutory scheme was unconstitutional. Therefore, while the Supreme Court in *Muniz* and *Butler II* emphasized the sheer number of in-person appearances that come with **quarterly** in-person registration and in-person verification provisions, which are admittedly lessened for offenders like Petitioner under subchapter I of Act 29, the Supreme Court did not endorse or reject annual in-person registration as constitutional or unconstitutional. Given how the Supreme Court in *Muniz* distinguished *Smith* on the basis of in-person appearances and disapproved of increased registration requirements for individuals who committed their crimes before the current enactment of the registration scheme, it appears annual **in-person** registration for offenders like Petitioner is an affirmative disability or restraint.

Further, examining subchapter I of Act 29's statutory scheme on the whole as applied to Petitioner, we find the Internet dissemination provision also constitutes an affirmative disability or restraint, as the Superior Court recently found in *Moore*, 222 A.3d at 23. With regard to the first factor, the Superior Court determined that the Internet dissemination provision is nearly identical to the SORNA website provision. Because the Internet dissemination provision, like the SORNA website provision, constitutes a punishment, "and punishment is a restraint," the Superior Court explained, "the Internet dissemination provision of [Act 29] constitutes an affirmative restraint." *Id.* In determining that this factor weighed in favor of finding Act 29 to be punitive, the Superior Court noted "the adverse impact to a sex offender's reputation, imposed purposefully as a consequence of conduct deemed criminal, is widespread," making the harm "consequential and far-reaching." *Id.* at 23-24. We agree with the Superior Court's reasoning and conclusion on this point.

In reaching this conclusion, we reiterate that for an *ex post facto* analysis, the **entire statutory scheme** as applied to Petitioner must be viewed in relation to what he had notice of at the time he committed his crimes. The petitioner in *Muniz* was convicted and sentenced in 2007, and there was no dispute that, at the times he committed and was convicted for his crimes, he would have been required to register as a sexual offender. However, as the Supreme Court found, the in-person quarterly registration, in-person updates, and SORNA website provision were more onerous than that which governed the petitioner's registration at the time he committed his crimes. Here, it bears emphasis that there was **no** registration requirement **at all** when Petitioner committed his crimes. Therefore, while annual in-person registration may be less onerous than quarterly in-person registration, the

31

statutory scheme of subchapter I of Act 29 as a whole as applied to Petitioner is a restraint in comparison to that which existed at the time he committed his crimes. While some form of registration for offenders like Petitioner may be constitutionally permissible, *see Smith*, 538 U.S. at 105, subchapter I of Act 29 in its entirety as applied imposes more than mere registration. Now, approximately 30 years after the commission of his crimes, Petitioner is required not only to register but to appear in person annually, notify PSP of any changes as a requirement of that registration, be at risk of additional criminal punishment if he does not comply, and be subject to posting of his information on the Internet for the rest of his life. Applying the Supreme Court's analysis in *Muniz*, and keeping at the forefront of our analysis the purpose of the *Ex Post Facto* clause, which is to "ensure[] that individuals have fair warning of applicable laws" at the time an offense is committed, *Peugh*, 569 U.S. at 544, we are constrained to conclude that this factor weighs in favor of finding subchapter I of Act 29 to be punitive as applied to Petitioner.

2. <u>Whether the sanction has historically been regarded as punishment.</u>

Petitioner argues that the annual in-person reporting requirements and the Internet dissemination provision are similar to traditional shaming punishments. Petitioner asserts that, as in *Muniz*, these provisions of subchapter I of Act 29 are "more akin to probation." (Petitioner's Br. at 13 (quoting *Muniz*, 164 A.3d at 1213).) Therefore, Petitioner contends that subchapter I of Act 29 "retains the same features" of SORNA that the Supreme Court determined were sanctions regarded as punishment. Petitioner argues that this factor weighs in favor of finding Act 29 to be punitive.

32

PSP disagrees, noting that the Supreme Court in *Muniz* found the registration requirements of SORNA resembled punishments due to their similarity to probation and the shaming nature of the SORNA website provision. PSP responds that subchapter I of Act 29 addresses these concerns. Specifically, PSP asserts that subchapter I of Act 29 makes registration requirements less onerous and, therefore, less similar to probation reporting requirements. With regard to the Internet dissemination provision, PSP contends the information required to be posted "is already public information or, at the very least, easily obtainable." (PSP's Br. at 6.) Further, the consequences for failure to comply with subchapter I of Act 29 are not similar to probation reporting requirements, PSP asserts, because probation violations are determined at a hearing, typically without involving police, whereas noncompliance with Act 29 resembles more traditional criminal prosecution with all the rights required thereunder. Moreover, PSP contends the General Assembly did not intend the Internet dissemination provision to be punitive and Petitioner's criminal conviction, not Act 29 requirements, causes any shaming effect that may exist from posting his information on the Internet.

In *Muniz*, the Supreme Court determined that the SORNA website provision and the in-person reporting requirements were sanctions historically regarded as punishments. 164 A.3d at 1212-13. The Supreme Court acknowledged that the United States Supreme Court in *Smith* concluded otherwise with regard to the Alaska statute on the basis that historic shaming was more than simple dissemination of public information and the information posted online was for the purpose of public safety rather than a means to shame the offender. *Id.* at 1212 (citing *Smith*, 538 U.S. at 98-99). "*Smith* was decided in an earlier technological environment," the Supreme Court in *Muniz* explained, and "[y]esterday's face-to-

33

face shaming punishment can now be accomplished online, and an individual's presence in cyberspace is omnipresent." *Id.* (quoting *Commonwealth v. Perez*, 97 A.3d 747, 765 (Pa. Super. 2014) (Donohue, J., concurring)). Further, the Supreme Court explained that SORNA and the Alaska statute at issue in *Smith* were "materially different" because the Alaska statute did not impose mandatory conditions like SORNA did. *Id.* Because the petitioner in *Muniz* would be required to register quarterly in person, notify PSP in person of changes in residence or employment, and face possible incarceration for noncompliance, the Supreme Court reasoned that SORNA's requirements resembled probation, a traditional form of punishment. *Id.* at 1213. Due to SORNA's similarity to probation requirements and the shaming nature of the SORNA website provision, the Supreme Court concluded that this factor weighed in favor of finding SORNA to be punitive. *Id.*

In *Butler II*, the Supreme Court further explained that "SVPs under [s]ubchapter H are subject to the same in-person reporting requirements as the Tier III offenders at issue in *Muniz* and SVPs also face incarceration for failure to comply with the RNC requirements." __ A.3d at __, slip op. at 25. Therefore, the Supreme Court found the RNC requirements similar to probation. *Id.* With regard to the dissemination of information about SVP registrants online, however, the Supreme Court distinguished "heightened public safety concerns applicable to SVPs that were not at issue in *Muniz*," and recognized that subchapter H provides a mechanism through which SVPs can seek removal from the Registry after 25 years. *Id.* at __, slip op. at 26. Therefore, with regard to the online registry and notification requirements imposed on SVPs, the Supreme Court determined they were not similar to traditional shaming punishments. Given this, the Supreme

34

Court found in *Butler II* that this factor did not weigh as heavily toward finding the provisions punitive for SVPs as it had in *Muniz* for offenders that are not SVPs. *Id.*

Our Supreme Court has recognized "probation itself may be a form of punishment." *Williams II*, 832 A.2d at 977. Individuals on probation are subject to the imposition of conditions, including "be[ing] subject to intensive supervision . . . and to notify the court or designated person of any change in address or employment," and having "[t]o report as directed to the court or the designated person and to permit the designated person to visit the [offender's] home." Sections 9754(b) and 9763(b)(11), (12) of the Sentencing Code, 42 Pa.C.S. §§ 9754(b), 9763(b)(11), (12). If an individual on probation violates probation conditions, the individual may be subject to incarceration. 42 Pa.C.S. § 9754(d). Pursuant to subchapter I of Act 29, Petitioner is required to appear annually in person for registration in order to verify residence information and to be photographed, 42 Pa.C.S. § 9799.60(b). Petitioner is required to notify PSP within three days of any change to his residence or employment information, 42 Pa.C.S. § 9799.56(a)(2). Petitioner is subject to **arrest and criminal sanction** if he does not verify his residence, notify PSP of changes, or appear for in-person registration, 42 Pa.C.S. § 9799.56(d). Consistent with our Supreme Court's precedent, and following *Muniz*, we discern no material difference between the conditions imposed in probation and the conditions imposed upon Petitioner under subchapter I of Act 29.

PSP contends that the imposition of criminal sanctions for failure to comply with the registration requirements is distinguishable from probation conditions, as a violation of probation is determined without the full panoply of rights attached to

35

criminal proceedings, such as those that would be commenced for failure to comply with subchapter I of Act 29. We are not persuaded that this distinction makes subchapter I of Act 29 as applied to Petitioner any less onerous or any less like a sanction that has historically been regarded as punishment. As the Supreme Court noted in *Muniz*, for either violations of probation conditions or sexual offender registration requirements, there is the need for a separate factual determination as to whether a violation has occurred. 164 A.3d at 1213. Moreover, the potential to be subject to incarceration for a violation of probation conditions or sexual offender registration requirements arises from the original underlying offense. *Id.* But for Petitioner's conviction, he would not be subject to the possibility of prosecution for failure to comply with subchapter I of Act 29, similar to an individual subject to incarceration for a failure to comply with probation conditions.

This distinction is highlighted by the Supreme Court's recent decision in *Butler II*. The Supreme Court distinguished the SVP provisions of subchapter H and the SORNA provisions at issue in *Muniz*, reasoning that this factor weighed less heavily towards being punitive where SVPs were concerned, as there was a heightened public safety concern. *Butler II*, __ A.3d at __, slip op. at 25-26. An offender who is categorized as a SVP is subject to the myriad of registration requirements because of **a post conviction determination** that the offender suffers from a mental abnormality, **not** because of the conviction. *Id.* at __, slip op. at 26. In contrast, Petitioner's requirements attendant to his registration under subchapter I derive from his conviction **alone**, a conviction which occurred before a registration scheme existed. Therefore, unlike a SVP, we examine Petitioner's

sanctions under *Muniz*, and they resemble probation and are of the nature historically regarded as punishment.

Petitioner also specifically challenges the Internet dissemination provision of subchapter I of Act 29 as applied to him, contending it is comparable to historical shaming punishments. As explained above, at the time Petitioner committed his triggering offense, there was no sexual offender registration scheme. At the time of Petitioner's release, Megan's Law II governed Petitioner's registration requirements and had no Internet dissemination provision. Under the amendments that constituted Megan's Law III, Petitioner was first subject to the dissemination of his information on the Internet, including his name, year of birth, residential address, the city and county of employment, his photograph, and a description and the date of his triggering offense. Section 9798.1(c) of Megan's Law III, *former* 42 Pa.C.S. § 9798.1(c). SORNA authorized Internet dissemination of, *inter alia*, Petitioner's name, aliases, year of birth, residence, address of employment, photograph, physical description, license plate number and vehicle registrations, triggering offense, and a statement regarding his SORNA registration compliance. Section 9799.28(b) of SORNA, *former* 42 Pa.C.S. § 9799.28(b). In *Muniz*, the Supreme Court concluded that the SORNA website provision was comparable to historic shaming punishments and advanced the traditional aims of punishment given the broad reach of the Internet and the extended amount of time during which it authorized dissemination of an offender's personal information. *Muniz*, 164 A.3d at 1212, 1215.

Subchapter I of Act 29 continues the SORNA website provision nearly identically. Pursuant to the Internet dissemination provision of subchapter I of Act 29, PSP must disseminate online Petitioner's:

37

(i) name and all known aliases; (ii) year of birth; (iii) . . . the street address, municipality, county and zip code of all residences, including, where applicable, the name of the prison or other place of confinement; (iv) the street address, municipality, county, zip code and name of an institution or location at which the person is enrolled as a student; (v) the municipality, county and zip code of an employment location; (vi) a photograph of the individual, which shall be updated not less than annually; (vii) a physical description of the offender, including sex, height, weight, eye color, hair color, and race; (viii) identifying marks, including scars, birthmarks and tattoos; (ix) the license plate number and description of a vehicle owned or registered to the offender; (x) whether the offender is currently compliant with registration requirements; (xi) whether the victim is a minor; (xii) a description of the offense or offenses which triggered the application of this subchapter; [and] (xiii) the date of the offense and conviction, if available . . . .

42 Pa.C.S. § 9799.63(c)(1). As the Supreme Court explained in *Muniz*, the public dissemination of this information online resembles historic shaming punishments and "exposes [Petitioner] to ostracism and harassment." 164 A.3d at 1212 (quoting *Perez*, 97 A.3d at 766 (Donohue, J., concurring)).

The Superior Court relied on *Muniz* in its recent decision in *Moore*. With regard to this factor, the Superior Court also noted that the Internet dissemination provision of subchapter I of Act 29 "is nearly identical" to that in SORNA. *Moore*, 222 A.3d at 22. Therefore, "[i]n light of these similarities, especially in terms of the broad method of dissemination," the Superior Court "conclude[d] that *Muniz* requires a finding that the [Internet] dissemination provision of [Act 29] is analogous to traditional public shaming, a historic form of punishment," and the factor weighed in favor of finding subchapter I punitive. *Id.* We believe the Superior Court's determination in *Moore* is correct, that there is no discernable difference between the SORNA website provision and the Internet dissemination provision of subchapter I of Act 29. Therefore, the Supreme Court's reasoning

38

underlying its determination in *Muniz* that the SORNA website provision was similar to a historic shaming punishment remains applicable to subchapter I of Act 29 as applied to Petitioner. Moreover, if the application of the Internet dissemination provision to an offender who was on notice of registration at the time the crimes were committed is punitive as a form of shaming punishment, such as in *Moore*, then the application of such provisions to Petitioner, who committed his crimes when there was no registration requirement, must also be punitive.

In consideration of the fact that the registration and verification requirements of subchapter I of Act 29 resemble probation, a form of punishment, and the Internet dissemination provision resembles historic shaming punishments, we find this factor weighs in favor of finding subchapter I of Act 29 to be punitive as applied to Petitioner.

3. <u>Whether the sanction comes into play only on a finding of scienter.</u>

Petitioner and PSP acknowledge that this factor did not carry much weight in the analysis in *Muniz* and, therefore, do not address this factor in detail. (Petitioner's Br. at 16 n.9; PSP's Br. at 3.) Although our Supreme Court found differently with regard to this factor in *Butler II*, that was because "the RNC requirements are not triggered on the basis of a finding of scienter," but rather on a determination of an offender's "mental abnormality or personality disorder." *Butler II*, __ A.3d at __, slip. op. at 26-27. Because Petitioner is not a SVP, like the appellee in *Butler II* was, we follow the reasoning in *Muniz*. As the Supreme Court has recognized with regard to non-SVP offenders, "where the concern of a sex offender registration statute . . . is protecting the public against recidivism, past criminal conduct is 'a necessary beginning point.'" *Muniz*, 164 A.3d at 1214

39

(quoting *Smith*, 585 U.S. at 105).  Accordingly, "this factor is of little significance in our inquiry."  *Id.*

4.  <u>Whether the operation of the sanction will promote the traditional aims of punishment – retribution and deterrence.</u>

Petitioner argues that subchapter I of Act 29 promotes retribution and deterrence because it authorizes the dissemination "to anyone with [I]nternet access all the same private information" that was authorized for disclosure under SORNA.  (Petitioner's Br. at 15 (emphasis omitted).)  Further, Petitioner asserts, Act 29 imposes punishment when an offender fails to register or provide accurate information.  Petitioner contends that subchapter I of Act 29 is no different from the SORNA website provision, which the Supreme Court found to be more retributive than prior versions of sexual offender registration statutes in Pennsylvania.  Petitioner argues this factor weighs in favor of finding subchapter I of Act 29 to be punitive.

PSP responds that subchapter I of Act 29 does not promote traditional aims of punishment like SORNA.  PSP argues the Supreme Court in *Muniz* concluded that SORNA promoted the traditional aims of punishment because several triggering offenses were misdemeanors, and some triggering offenses did not have a sexual component, and due to the quarterly in-person reporting requirements and breadth of information available on the Internet.  The General Assembly addressed these concerns through subchapter I of Act 29, PSP asserts, as subchapter I: contains fewer triggering offenses; eliminates triggering offenses that do not have a sexual component; ensures nearly all triggering offenses are felonies rather than misdemeanors; and reduces registration durations and the in-person reporting requirements.

40

The Supreme Court in *Muniz* determined that SORNA operated to promote traditional aims of punishment due to the SORNA website provision and the large breadth of triggering offenses, some of which were not felonies or did not have a sexual component. 164 A.3d at 1215. Although the petitioner in *Muniz* asserted that the application of SORNA to him was unconstitutional, the Supreme Court considered the statutory scheme on the whole when it discussed whether SORNA promoted traditional aims of punishment. Thus, the Supreme Court analyzed SORNA with regard to the offenders subject to its provisions as a result of the offenses they committed. The Supreme Court concluded in *Butler II* that the RNC requirements and counseling requirements for SVPs did not promote retribution because for SVPs "recidivism is obviated through" such provisions; a "distinction [that] responds to the understanding that SVPs, who cannot control their behavior due to a mental abnormality or personality disorder, are unlikely to be deterred from re-offending even by threats of confinement." __ A.3d at __, slip op. at 27. This was in contrast to *Muniz*, the Supreme Court explained, where SORNA requirements were "applicable only upon a conviction for a predicate offense." *Id.* (quoting *Muniz*, 164 A.3d at 1215). Because the RNC requirements of subchapter H are not imposed on conviction, but rather after a determination of SVP status by the Board, the Supreme Court found this factor to weigh in favor of finding these requirements to be nonpunitive. *Id.*

PSP asserts that subchapter I of Act 29 on the whole does not promote traditional aims of punishment like SORNA did because of its discernable differences from SORNA. As PSP notes, subchapter I of Act 29 is different from SORNA in terms of the triggering offenses. SORNA included triggering offenses that lacked a sexual component, including those related to unlawful restraint, false

41

imprisonment, and interference with custody of children in violation of Sections 2902(b), 2903(b) and 2904 of the Crimes Code, respectively, 18 Pa.C.S. §§ 2902(b), 2903(b), 2904. Section 9799.14 of SORNA, *former* 42 Pa.C.S. § 9799.14. These offenses, along with others that were present in SORNA, are not included in subchapter I of Act 29, subchapter I includes only two offenses without a sexual component.[18] Section 9799.55 of Act 29, 42 Pa.C.S. § 9799.55. The General Assembly also reduced the duration of registration attached to certain triggering offenses, such as those relating to sexual exploitation of children and unlawful contact with a minor, offenses that carried a 25-year registration period under SORNA and carry a 10-year registration period under subchapter I of Act 29. *Compare former* 42 Pa.C.S. §9799.14(c), *with* 42 Pa.C.S. § 9799.55(a).

However, the existence of fewer triggering offenses or offenses without a sexual component in subchapter I of Act 29 as compared to SORNA is immaterial as applied to Petitioner here who faced **no** obligation of registration at the time he committed his offenses. We note that the Supreme Court's analysis in *Muniz* of the entire statutory scheme of SORNA was in relation to former versions of the statute and that the petitioner in *Muniz* committed his crimes when a prior version of a registration scheme was in existence. Again, we emphasize that here, there was no registration scheme for Petitioner when he committed his crimes and was convicted and sentenced. Therefore, the critical inquiry here is not whether subchapter I of Act 29 is less punitive than SORNA on the whole but, rather, whether the entire statutory scheme of subchapter I of Act 29 is punitive as applied

---

[18] These offenses are kidnapping a minor and luring a child into a motor vehicle or structure in violation of Sections 2901 and 2910 of the Crimes Code, respectively, 18 Pa.C.S. §§ 2901, 2910.

42

to an offender like Petitioner who committed his offense when there was no registration scheme. *See, e.g.*, *Weaver*, 450 U.S. at 30; *Wood*, 208 A.3d at 136.

Further, Petitioner's obligations under subchapter I of Act 29 arise not from a separate determination that he possesses an abnormality that makes him dangerous, like a SVP, such as in *Butler II*, but because of an offense he committed prior to the enactment of a registration scheme. As the Supreme Court explained in *Butler II*, registration provisions in the nature of those in SORNA can be retributive in effect when they are based on the conviction for the predicate offense. __ A.3d at __, slip op. at 27. Here, the provisions governing Petitioner's registration are based alone upon his conviction for the predicate offense. Because Petitioner did not have fair warning at the time of commission of the offenses that he would have multifaceted registration requirements for his lifetime, and his registration requirements derive from his conviction alone, we agree with Petitioner that this factor weighs in favor of finding subchapter I of Act 29 to be punitive as applied to him, regardless of any discernable differences between SORNA and subchapter I of Act 29 with regard to offenses requiring registration.

Petitioner additionally relies upon the Internet dissemination provision to argue that subchapter I of Act 29 as applied to him promotes traditional aims of punishment. In *Muniz*, the Supreme Court concluded that "the prospect of being labeled a sex offender accompanied by registration requirements and the public dissemination of an offender's personal information over the [I]nternet has a deterrent effect." 164 A.3d at 1215. Although acknowledging that the mere presence of a deterrent effect alone did not render the sanctions of SORNA criminal, the Supreme Court found, after a thorough review of SORNA, that there was more than a mere presence of deterrent effect. The Supreme Court reasoned

43

that SORNA was unlike the SVP provisions of Megan's Law II, which the Supreme Court concluded in *Williams II* did not have a deterrent or retributive effect. Nor was SORNA like the Alaska statute at issue in *Smith*, where the United States Supreme Court reasoned that the dissemination of accurate information of public record did not have a punitive effect. Rather, in *Muniz*, the Supreme Court stated, "the information SORNA allows to be released over the [I]nternet goes beyond publicly accessible conviction data," to include addresses of residence and employment, physical description, and vehicle information. *Id.* at 1215-16. The Supreme Court further explained while it found in *Williams II* that the dissemination provisions of Megan's Law II were necessary for public safety, it also stated that Megan's Law II "need not be read to authorize [the] public display of the information, as on the Internet," which was not the case under SORNA. *Muniz*, 164 A.3d at 1216 (quoting *Williams II*, 832 A.2d at 980). On the whole, SORNA was an "increase in retributive effect," from that in Megan's Law II, and the Supreme Court weighed this factor in favor of finding SORNA to be punitive. *Id.*

We agree with Petitioner that this factor weighs in favor of finding subchapter I of Act 29 to be punitive as applied to him. As previously explained, the Internet dissemination provision of subchapter I of Act 29 retains all the same features that the Supreme Court disapproved of in *Muniz* with regard to SORNA. Subchapter I of Act 29 authorizes the dissemination of Petitioner's personal information online for his lifetime. Although PSP asserts that the information subject to dissemination is already of public record, this argument was already rejected by the Supreme Court in *Muniz*. *Id.* at 1215-16. As with SORNA, subchapter I of Act 29 requires dissemination of more than the mere fact of

conviction, which is public record. It includes, *inter alia*, Petitioner's work and home addresses, physical description, photograph, and vehicles he owns. 42 Pa.C.S. § 9799.63(c)(1). The dissemination of this information advances a retributive purpose, as it "affix[es] culpability for prior criminal conduct." *Muniz*, 164 A.3d at 1215 (alteration in original) (citation omitted). As the Superior Court in *Moore* stated with regard to this factor,

> [s]ince the Supreme Court concluded that the Internet dissemination provision of SORNA [] has both a deterrent and retributive effect, and the Internet dissemination provision of [Act 29] is identical to the one in SORNA [], we must conclude that the Internet dissemination provision of [Act 29] has both a deterrent and retributive effect.

*Moore*, 222 A.3d at 24. Accordingly, consistent with *Muniz*, we conclude that the entire statutory scheme on the whole as applied to Petitioner promotes traditional aims of punishment and this factor weighs in favor of finding subchapter I of Act 29 to be punitive as applied to Petitioner.

5. <u>Whether the behavior to which the sanction applies is already a crime.</u>

Petitioner concedes that the behavior to which subchapter I of Act 29 applies is already a crime, noting that the Supreme Court in *Muniz* acknowledged the same with regard to SORNA. Because this factor did not carry much weight in the analysis in *Muniz*, PSP does not address this factor in detail. Similar to the third *Mendoza-Martinez* factor, the Supreme Court concluded in *Muniz* that "this factor carries little weight in the balance," "recognizing where SORNA is aimed at protecting the public against recidivism, past criminal conduct is 'a necessary beginning point.'" 164 A.3d at 1216 (quoting *Smith*, 583 U.S. at 105). The Supreme Court concluded otherwise in *Butler II*, again on the basis that RNC requirements in subchapter H "are not applied to conduct at all, but to an

45

individual's status as suffering from a serious psychological defect," that increases the likelihood that an individual will engage in a sexual offense again. ___ A.3d at __, slip op. at 28. Because Petitioner's requirements flow from his conviction rather than a SVP determination, we again follow *Muniz* and do not give much weight to this factor in our analysis of subchapter I of Act 29 as applied to Petitioner.

6. <u>Whether an alternative purpose to which the sanction may rationally be connected is assignable for it.</u>

Petitioner concedes that subchapter I of Act 29 has a "rational connection to 'protect[ing] the safety and general welfare of the people of this Commonwealth.'" (Petitioner's Br. at 17 (alteration in original) (quoting 42 Pa.C.S. § 9799.51(b)(1)).) Therefore, Petitioner admits that this factor weighs in favor of finding subchapter I of Act 29 nonpunitive. PSP agrees that there is an alternative purpose to which subchapter I of Act 29 may be rationally connected. Relying upon the Supreme Court's reasoning in *Muniz* that such policy considerations are within the purview of the General Assembly, PSP asserts the purpose of Act 29 is public safety and this factor weighs in favor of subchapter I being nonpunitive.

The Supreme Court has consistently recognized the nonpunitive purpose of sexual offender registration laws in the Commonwealth. With regard to Megan's Law I, our Supreme Court in *Gaffney* explained "the legislature's intent in requiring offenders to register with [PSP] regarding their whereabouts was not retribution; rather the . . . intent was to provide a system of registration and notification" for the purpose of promoting public safety. 733 A.2d at 619. In *Williams II*, the Supreme Court stated "the legislative findings" underlying Megan's Law II "are consistent with grave concerns over the high rate of recidivism among convicted sex offenders." 832 A.2d at 979 (internal quotations

46

omitted). With regard to Megan's Law III, the Supreme Court again acknowledged the legislative purpose of addressing the high risk of recidivism in sexual offenders and ensuring public safety. *Commonwealth v. Wilgus*, 40 A.3d 1201, 1205 (Pa. 2012). In *Muniz*, the Supreme Court reiterated the same for SORNA. While noting conflicting studies regarding the effectiveness of sexual offender registration laws and the likelihood of recidivism among sexual offenders, the Supreme Court determined "policy regarding such complex societal issues, especially when there are studies with contrary conclusions, is ordinarily a matter for the General Assembly." *Muniz*, 164 A.3d at 1217. Because the General Assembly made the legislative finding that sexual offenders pose a high risk of reoffending and protection of the public from these types of offenders is a government interest, the Supreme Court "defer[red] to the General Assembly's findings on this issue." *Id.* The Supreme Court reiterated again that there was an alternative nonpunitive purpose of subchapter H of Act 29 in *Butler II*, although it reasoned that the conflict in any studies with regard to the high risk of recidivism among sex offenders was not relevant as it was in *Muniz* because SVPs "underwent individual assessments that led to a finding [that] they are highly likely to reoffend due to a mental abnormality or personality disorder." *Butler II*, __ A.3d at __, slip op. at 28.

There is no dispute that subchapter I of Act 29, like its predecessors, has a rational nonpunitive purpose. The General Assembly has made extensive legislative findings that:

> (1) If the public is provided adequate notice and information about [SVPs] and offenders . . . , the community can develop constructive plans to prepare itself for the release of [SVPs] and offenders. . . .

47

(2) These [SVPs] and offenders pose a high risk of engaging in further offenses even after being released from incarceration or commitments, and protection of the public from this type of offender is a paramount governmental interest.

(3) The penal and mental health components of our justice system are largely hidden from public view, and lack of information from either may result in failure of both systems to meet this paramount concern of public safety.

(4) Overly restrictive confidentiality and liability laws governing the release of information about [SVPs] and offenders have reduced the willingness to release information that could be appropriately released under the public disclosure laws and have increased risks to public safety.

(5) Persons found to have committed a sexual offense have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government.

(6) Release of information about [SVPs] and offenders to public agencies and the general public will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems so long as the information released is rationally related to the furtherance of those goals.

42 Pa.C.S. § 9799.51(a). Based upon these findings, the General Assembly has set forth that its policy in subchapter I of Act 29 is to:

(1) Protect the safety and general welfare of the people of this Commonwealth by providing for registration, community notification and access to information regarding [SVPs] and offenders who are about to be released from custody and will live in or near their neighborhood.

(2) Require the exchange of relevant information about [SVPs] and offenders among public agencies and officials and to authorize the release of necessary and relevant information about sexually violent predators and offenders to members of the general public, including information available through the publicly accessible Internet website

of the [PSP], as a means of assuring public protection and shall not be construed as punitive.

. . . .

(4) Address the Pennsylvania Supreme Court's decision in . . . *Muniz*, . . . and the Pennsylvania Superior Court's decision in . . . *Butler* [*I*] . . . .

42 Pa.C.S. § 9799.51(b). In consideration of the General Assembly's stated findings and intent and the precedent in this Commonwealth acknowledging the nonpunitive purpose of the various iterations of sexual offender laws, we also "defer to the General Assembly's findings on this issue," *Muniz*, 164 A.3d at 1217. Because Act 29 clearly has a purpose beyond punishment, this factor weighs in favor of finding subchapter I of Act 29 to be nonpunitive as applied to Petitioner.

7. <u>Whether the sanction appears excessive in relation to the alternative purpose assigned.</u>

Although Petitioner agrees that subchapter I of Act 29 has an alternative purpose to which it may be rationally connected, Petitioner argues that it is excessive in relation to that purpose. Specifically, Petitioner argues subchapter I of Act 29 could achieve its purpose of protecting the public without annual in-person reporting requirements or public dissemination of information online. Rather, Petitioner contends that subchapter I of Act 29 could achieve its intended purpose by requiring: yearly information updates by mail, in-person reporting requirements every four years, and/or limiting registration to a county-based publicly accessible registry where the registrant lives and works. While acknowledging that subchapter I is an improvement from SORNA because it provides the opportunity to petition for exemption from registration requirements under certain

49

circumstances, Petitioner argues that it nonetheless "still does more to shame, restrain, and harm offenders, like Petitioner, than is necessary for protecting the public." (Petitioner's Br. at 19.) Despite the General Assembly's intent to address the concerns of the Supreme Court in *Muniz* through subchapter I of Act 29, Petitioner asserts this factor and the *Mendoza-Martinez* factors on the whole still weigh in favor of finding subchapter I of Act 29 punitive. At the time of commission of his offenses and convictions, Petitioner argues, he could not have anticipated that his conduct "would[] subject[] him to the . . . sanctions imposed by [Act 29]." (Petitioner's Br. at 20.) Therefore, Petitioner asks this Court to grant the Application and conclude that subchapter I of Act 29 is unconstitutional as applied to him.

PSP disagrees, responding that subchapter I of Act 29 is not excessive compared to its purpose of promoting public safety. PSP notes that the Supreme Court in *Muniz* determined SORNA was excessive in relation to its purpose because it categorized a broad range of individuals as sexual offenders, including those convicted of offenses that lacked a sexual component, without allowing a mechanism for being relieved from lifetime reporting requirements. PSP argues that subchapter I of Act 29 responds to this problem by including only two triggering offenses without a sexual component; reducing the registration period for many offenses; and providing a mechanism to petition for removal from the Registry and registration requirements after 25 years. PSP asserts these distinguishing features between SORNA and Act 29 demonstrate that subchapter I of Act 29 is not excessive and this factor should weigh in favor of it being nonpunitive. Moreover, PSP contends Petitioner's suggestions for alternative provisions that would make subchapter I of Act 29 less excessive in comparison to

50

its purpose are not relevant. The question before this Court "is not whether a 'better' law could be created," but "whether Act 29 is nonpunitive when considering the concerns the Supreme Court expressed in *Muniz*." (PSP's Br. at 8.)

In *Muniz*, the Supreme Court analyzed SORNA's excessiveness in terms of its "entire statutory scheme," rather than only as applied to the petitioner or a class of registrants, such as SVPs. 164 A.3d at 1218. In *Muniz*, our Supreme Court noted its acknowledgment in *Williams II* of the possibility that Megan's Law II could be excessive if it resulted in individuals who do not pose the type of risk contemplated by the General Assembly being classified as SVPs. The Supreme Court also emphasized the societal interest in ensuring a sex offender registration law is not "over-inclusive." *Id.* (quotation omitted). Because SORNA "categorize[d] a broad range of individuals as sexual offenders subject to its broad provisions, including those convicted of offenses that do not specifically relate to a sexual act," the Supreme Court "conclude[d] SORNA's requirements [were] excessive and over-inclusive in relation to the statute's alternative assigned purpose of protecting the public from sexual offenders." *Id.*

The Supreme Court recounted this reasoning in *Butler II* and explained that, in contrast to SORNA, "[o]ver-inclusiveness [wa]s not at issue" in *Butler II* "because the RNC requirements apply only to SVPs who have been individually determined to suffer from a mental abnormality or personality disorder." __ A.3d at __, slip op. at 29. Given this difference from *Muniz*, the Supreme Court reasoned that the RNC requirements for SVPs were reasonably related to serving the government's legitimate goal of reducing recidivism and protecting the public. *Id.* Further, because SVPs can now petition for removal from the Registry after 25

years, a provision that did not exist previously, the Supreme Court determined "the statutory scheme of [s]ubchapter H is even less problematic than the scheme [of Megan's Law II that it] deemed not excessive in *Williams II . . . .*" *Id.* Thus, the Supreme Court concluded in *Butler II* that this factor weighed in favor of finding subchapter H to be nonpunitive.

Although Petitioner asserts an as applied challenge to subchapter I of Act 29, because the Supreme Court in *Muniz* looked to the statutory scheme on the whole to determine excessiveness in relation to the rational purpose, we will begin our analysis the same way. As explained above, we recognize that subchapter I of Act 29 is different from SORNA in terms of the triggering offenses. Further, subchapter I of Act 29 has a provision for exemption from registration requirements, allowing an offender to petition for exemption after 25 years have elapsed during which the offender has not been convicted of a crime punishable by imprisonment of more than 1 year. 42 Pa.C.S. § 9799.59(a). SORNA contained no such provision. However, unlike in *Butler II*, these provisions do not weigh in favor of finding subchapter I Act 29 to be nonpunitive in the present case as applied to an offender like Petitioner who committed his crimes before a registration statute existed and who is not determined to possess a mental abnormality that makes him dangerous or increases his likelihood of reoffending. Again, Petitioner, at the time he committed his offense, was not aware that he would ever be subject to registration following a period of incarceration. Petitioner asserts that his registration under Act 29, with requirements such as annual in-person registration and the Internet dissemination provision, make subchapter I of Act 29 excessive in relation to its purpose, and he could not have anticipated these sanctions at the time of his crime. We are constrained to agree.

Our analysis requires that we examine the application of the entire statutory scheme of subchapter I of Act 29 to Petitioner in relation to the obligations that existed at the time he committed his offenses. Even if subchapter I of Act 29 differs from SORNA in terms of triggering offenses, it is still excessive in relation to its purpose where it imposes requirements that are punitive in nature upon offenders who committed their crimes prior to Megan's Law I. Petitioner, and similarly situated offenders, are subject to more than mere registration under subchapter I of Act 29, as their registration imposes affirmative restraints and probation-like conditions by requiring annual in-person appearances, updates within three days for changes to information, and publication on the Internet of personal information. Therefore, subchapter I of Act 29, on the whole as applied to Petitioner, is over-inclusive not simply because it captures offenders who committed their crimes before the existence of a statutory registration scheme, but because the registration requirements are, in their entirety, excessive for such offenders, particularly in relation to the General Assembly's purpose.

With regard to this factor, Petitioner again emphasizes the Internet dissemination provision as excessive in relation to the purpose of subchapter I of Act 29. We agree that the Internet dissemination provision in and of itself is excessive in relation to the purpose as applied to Petitioner. Although the General Assembly set forth its intent to protect the public by disseminating relevant information about "offenders who are about to be released from custody and **will live in or near their neighborhood**," 42 Pa.C.S. § 9799.51(b)(1) (emphasis added), and facilitating and authorizing the release of "necessary and relevant information" to the public and public agencies, 42 Pa.C.S. § 9799.51(b)(2), the Internet dissemination provision goes beyond this. Subchapter I of Act 29

mandates dissemination of a breadth of an offender's information to "**the public . . . , without limitation,** . . . to view an individual record or the records of all . . . offenders." 42 Pa.C.S. § 9799.63(b)(1) (emphasis added). The scope of information and access thereto authorized under subchapter I of Act 29 is excessive in relation to the assigned purposes of protecting the public in the immediate vicinity where the offender resides. As the Superior Court explained in *Moore*:

> Because the dissemination of the sex offender's registration information is not limited to those individuals who could benefit from the information, but rather is expanded to any person who has Internet access, the open and readily accessible website is incongruous with the targeted purpose of protecting a community or neighborhood. [Act 29] does not limit access to offender information within a certain geographical area, a community, or neighborhood. Any user of the website can obtain information about any offender regardless of the user's geographical proximity to the offender. Thus, if a person is not in proximity to an offender, the user's use of the information is beyond the legislative purpose of providing the information to protect individuals who might encounter the offender.

222 A.3d at 26. Further, by requiring dissemination of an offender's information other than that which directly relates to the triggering crime is beyond the scope of "necessary and relevant information" for the public and public agencies. 42 Pa.C.S. § 9799.51(b)(2). Given this, and the fact that Petitioner had no notice that he would be subject to such registration requirements at the time he committed his offenses, we agree that the Superior Court's thoughtful and careful analysis is consistent with *Muniz*.

Petitioner committed his crimes in 1990 and, therefore, he had no notice that he would be subject to any registration requirements, let alone a variety of increasing registration requirements, for his lifetime, including dissemination of his

personal information on the Internet. Accordingly, consistent with *Muniz* and *Moore*, we must conclude that subchapter I of Act 29 is excessive in relation to its purpose, such that this factor weighs in favor of finding it punitive as applied to Petitioner.

### C. Balance of the Mendoza-Martinez Factors

On the whole, balancing the factors in accordance with the analysis used by our Supreme Court in *Muniz*, we must find that five of the seven weigh in favor of finding subchapter I of Act 29 to be punitive when applied to Petitioner. PSP's arguments to the contrary focus on the differences between SORNA and subchapter I of Act 29 that were intended to address the Supreme Court's decision in *Muniz*. However, these arguments overlook the fact that the requirements of SORNA or any prior registration scheme did not exist at the time of Petitioner's offense. While some form of retroactive registration requirements may be constitutional, *see Smith*, 538 U.S. at 105, applying the analysis in *Muniz*, we must find the cumulative effect of the registration requirements of subchapter I of Act 29 on Petitioner goes beyond imposing mere registration and is punishment. Petitioner, who committed the crimes giving rise to his present obligation to register in 1990, could not "have fair warning" of the applicable law that now mandates his registration and the terms thereof. *Peugh*, 569 U.S. at 544. His right to relief on these *ex post facto* claims is not premised in a "right to less punishment, but the lack of fair notice and governmental restraint" that occurred when the General Assembly "increase[d] punishment beyond what was prescribed when the crime was consummated." *Weaver*, 450 U.S. at 30. Accordingly, we determine that the *Mendoza-Martinez* factors weigh in favor of finding subchapter

I of Act 29 to be punitive as applied to Petitioner under the *Ex Post Facto* clause of the United States Constitution.[19, 20]

## V. Conclusion

We recognize the General Assembly made changes in Act 29 in an effort to correct the deficiencies the Supreme Court had found in *Muniz*. However, when we apply the Supreme Court's analyses in *Muniz* and *Butler II*, these changes do not sufficiently alter the balance of the *Mendoza-Martinez* factors as applied to Petitioner. These factors weigh in favor of finding subchapter I of Act 29 to be punitive as applied to Petitioner, who committed his offense before there was any registration or notification requirement, such that it outweighs the legislative intent to be nonpunitive.

In addition to declaring subchapter I of Act 29 unconstitutional as applied to him, Petitioner requests the Court "compel PSP to **permanently** remove Petitioner from the . . . [R]egistry." (Petition,–Wherefore Clause (emphasis added).) However, this Court decides only the issue before us, which is whether subchapter I of Act 29 violates the *Ex Post Facto* clause as applied to Petitioner, and thus

---

[19] The Supreme Court in *Muniz* did not analyze the severability of the provisions of SORNA that it emphasized as punitive in its analysis of the *Mendoza-Martinez* factors, but determined the entire statute as applied to the petitioner was unconstitutional. Here, we do not attempt to sever pieces of subchapter I of Act 29 but, as the Supreme Court did in *Muniz*, examine subchapter I of Act 29 in its entirety as applied to Petitioner.

[20] In reaching this conclusion, we note that this decision is aligned with various other state appellate courts that have similarly concluded an *ex post facto* violation exists where the offender to whom the sexual offender registration statute is applied committed the triggering offense before a registration statute was enacted. *See, e.g*., *Starkey v. Okla. Dep't of Corr.*, 305 P.3d 1004, 1030 (Okla. 2013); *Nebraska v. Siminick*, 779 N.W.2d 334, 342 (Neb. 2010); *Wallace v. Indiana*, 905 N.E.2d 371, 384 (Ind. 2009); *Doe v. Dep't of Pub. Safety & Corr. Servs.*, 62 A.3d 123, 133-34 (Md. Ct. App. 2013). *But see R.W. v. Sanders*, 168 S.W.3d 65, 71 (Mo. 2005); *Oregon v. MacNab*, 51 P.3d 1249, 1256 (Or. 2002).

whether his registration under that legislation is permissible. Based on *Muniz*, we find that it is not, and therefore will order PSP not to apply subchapter I of Act 29 to Petitioner, which will result in his removal from the Registry. Accordingly, we grant in part and deny in part Petitioner's Application.


_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

T.S.,                                          :
               Petitioner    :
                               :
            v.                     :  No. 129 M.D. 2019
                               :
Pennsylvania State Police,                     :
            Respondent   :

## **O R D E R**

     **NOW**, May 11, 2020, T.S.'s (Petitioner) Application for Summary Relief (Application) is hereby **GRANTED in part**. Judgment is entered in favor of Petitioner declaring the application of subchapter I of the Act of February 21, 2018, P.L. 27, 42 Pa.C.S. §§ 9799.10-9799.75, *as amended by* the Act of June 12, 2018, P.L. 140, as applied to Petitioner is unconstitutional as it is in violation of the *ex post facto* clauses of the United States and Pennsylvania Constitutions when applied to Petitioner. The Pennsylvania State Police is, therefore, hereby **ORDERED** not to apply subchapter I of Act 29 to Petitioner, which will result in his removal from the sexual offender registry. To the extent Petitioner seeks relief in the form of permanent removal from the sexual offender registry, the Application is **DENIED**.

                                                _____
                                              **RENÉE COHN JUBELIRER,** Judge